IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LYNNE MARGARET GIBBONS,     \*
     \*
    *Plaintiff*     \*
     \*
v.     \*    Civil No. JFM-08-3511
     \*
BANK OF AMERICA CORP., ET AL.     \*
     \*
     \*
     \*
    *Defendants.*     \*
     \*
     \*\*\*\*\*

## MEMORANDUM

Plaintiff Lynne Margaret Gibbons ("Plaintiff" or "Lynne Gibbons") filed this action against Banc of America Investment Services, Inc. ("BAIS" or "the Bank"), Bank of America Corporation ("BAC"), and Bank of America, N.A. ("BANA") (collectively "Defendants").[1] Plaintiff alleges these companies wrongfully instituted a prior action against her. Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The motion has been fully briefed and no hearing is necessary. *See* Local Rule 105.6. For the reasons below, Defendants' motion for summary judgment will be granted.

---

[1] Plaintiff originally named only Bank of America Corporation ("BAC") as Defendant, but in denying BAC's motion to dismiss this court ordered Plaintiff to amend her complaint and add Bank of America Investment Services ("BAIS" or "the Bank") as a defendant. (Order Re: Mot. to Dismiss, ECF No. 14 at 2). BAIS and Bank of America, N.A. ("BANA") are both subsidiaries of BAC. (Def. Answer ¶¶ 4–5). BAIS is a broker-dealer and BANA provides retail banking and financial services. (*Id.*). Both parties now agree that BAIS is the real party in interest in the present action. (Def. Mot. Summ. J. at 48–49; Pl.'s Opp'n at 64).

I.      BACKGROUND

This case arises out of BAIS's efforts to recoup more than $1.6 million stolen from its customers by the Plaintiff's husband, Thomas Gibbons, during his employment as a financial advisor for the Bank.

1.   Fraudulent Scheme

Thomas Gibbons conducted a series of unauthorized transactions in client accounts from February 1999 to March 2005, misappropriating approximately $1.6 million in funds from Bank clients.  (Def. Answer ¶ 12).  He deposited those stolen funds into two checking accounts at Provident Bank of Maryland.  (Def. Mot. Summ. J. ("Def. Mot.") Ex. 3, Dep. of Thomas Gibbons ("T. Gibbons Dep.") 42:19–47:10).  One of the accounts was held in the name of a fictitious company, L&S Computer Consultants ("LSCC Provident Account").  (*Id.* 43:11–16). The other account was held jointly with Lynne Gibbons ("Joint Provident Account").  (*Id.* 46:1–47:10).  Although Lynne Gibbons believed her husband had closed the Joint Provident Account shortly after he began work at the Bank, he in fact kept the account active and used it to carry out his fraud.  (Pl.'s Opp'n Mot. Summ. J. ("Pl.'s Opp'n") Ex. 4, 2006 Dep. of Lynne Gibbons ("2006 L. Gibbons Dep.") 62:6–63:20).  Thomas Gibbons testified that he routinely transferred portions of the stolen funds from the LSCC Provident Account to the Joint Provident Account, then wrote checks to cash that he deposited into joint accounts he and Lynne Gibbons held at BANA ("BANA joint accounts").  (T. Gibbons Dep. 45:7–47:10, 50:10–51:15, 56:18–66:21). Thomas Gibbons recorded the deposits of stolen funds into the checkbook registers he and the Plaintiff shared for their BANA joint accounts.  (*Id.* 116:14–127:5).  The registers show that after each deposit of stolen funds, Plaintiff made numerous withdrawals for various expenses.  (Def. Mot. Ex. 4).

2.   Discovery of Fraud

The Bank learned of Thomas Gibbons' fraud in April of 2005, after one of his victims
called a supervisor to inquire about her deceased mother's investments.  (Pl.'s Opp'n Ex. 6,
Letter from Jay Norton to Karen Tustin ("Norton Letter") 1–2; Def. Mot. Ex. 2, Decl. of George
Magnotta ("Magnotta Decl.") ¶ 15).  The Bank fired Thomas Gibbons on April 13, 2005.
(Norton Letter at 1).

Lynne Gibbons learned of her husband's fraud when he phoned her on April 14, 2005.
(Def. Mot. Ex. 11, 2011 Dep. of Lynne Gibbons ("2011 L. Gibbons Dep.") 153:11–154:12).
Thomas Gibbons told his wife that he had been fired, that he had defrauded clients of money,
and that the Bank was filing suit against them both.  (*Id.*; Pl.'s Opp'n Ex. 8, 2007 Aff. of Lynne
Gibbons ("2007 L. Gibbons Aff."), ¶ 4).  Lynne Gibbons maintains she had no knowledge of her
husband's fraud until that time.  (2011 L. Gibbons Dep. 153:19–154:4).  During the phone call,
Thomas Gibbons also told his wife he was abandoning her and their five children.  (2007 L.
Gibbons Aff. ¶ 5).  Since that day, Thomas Gibbons has not returned to the family's home.  (*Id.*)

Prior to bringing any legal action, the Bank began investigating Thomas Gibbons' fraud.
The Bank learned that Thomas Gibbons had stolen a significant amount of money from one
victim and deposited the funds into his two Provident accounts.  (Magnotta Decl. ¶¶ 15–20).  It
also learned stolen money was withdrawn from the Provident Joint Account and deposited into
the BANA Joint Accounts, and that Lynne Gibbons had written numerous checks on the joint
BANA checking account.  (*Id.* ¶ 23; Pl.'s Opp'n Ex. 15, Dep. of Dennis Altman ("Altman
Dep."), 6:9–28:3, 33:11–17; 35:3–8).  Lynne Gibbons' name also appeared on each check
written from the Joint Provident Account.  (Def. Mot. Ex. 6).  Further, the Bank learned Thomas

Gibbons used a P.O. Box he and Lynne Gibbons had owned since 1993 to execute his scheme. (Magnotta Decl. ¶¶ 15–16, 24).  Bank officials also realized that as they investigated the scheme the balance of the accounts was quickly diminishing; one was reduced by more than $20,000 in a single day.  (*Id.* ¶ 25.).  Bank officials did not interview Lynne Gibbons before filing suit.  (Pl.'s Opp'n Ex. 1, 2011 Decl. of Lynne Gibbons ("2011 L. Gibbons Decl."), ¶ 23).  Plaintiff claims the Bank's only basis for suing her was her joint ownership of and withdrawal of money from bank accounts in which Thomas Gibbons deposited stolen money.  (*See* Pl.'s Opp'n at 13).

3.   Legal Actions Initiated by Bank

On April 15, 2005, the Bank filed a complaint against both Thomas and Lynne Gibbons in the Circuit Court for Hartford County ("underlying suit").[2]  At the same time, the Bank sought a temporary restraining order ("TRO") to freeze bank accounts held by Thomas and Lynne Gibbons.  The Bank later sought to secure an interest in the family's home.

a.   Suit against Thomas and Lynne Gibbons

The April 15 complaint alleged five causes of action against Thomas and Lynne Gibbons: conversion, tort, civil conspiracy, fraud, and injunctive relief.  (Pl.'s Opp'n Ex. 17 ("First Complaint")).  Only the conversion, conspiracy, and injunctive relief claims referenced Lynne Gibbons.  (*Id.* ¶¶ 27, 35, 51–52).  Those counts alleged she converted funds of Bank customers for her use and that she conspired with her husband in his fraudulent scheme.  (*Id.* ¶¶ 27, 35).

---

[2] The caption on the underlying suit says that case was filed by BAC.  However, both parties agree that BAIS was the real party in interest in that action and that the underlying suit was brought by BAIS and litigated by BAIS.  (*See* Mot. to Dismiss at 47; Pl's Opp'n at 64). The underlying suit is therefore treated as one filed by BAIS.

Over the next month, the Bank amended its complaint twice.  It first amended the complaint on May 6, 2005. (Pl.'s Opp'n Ex. 49 ("Second Complaint")).  The Second Complaint alleged the same five causes of action.  (*Id.*).  It also added two new defendants: Glenda M. Morris, and Jane Doe (later identified as Marie Harris), both women to whom Thomas Gibbons transferred stolen funds.  (*Id.*; *see also* Def. Mot. at 8).  Again, only the conversion, conspiracy, and injunctive relief counts referenced Lynne Gibbons.  (Second Compl. ¶¶ 33, 43, 59–60).

The Bank amended its complaint again in June of 2005.[3]  (Pl.'s Opp'n Ex. 23 ("Third Complaint")).  The Third Complaint alleged only four causes of action.  (*Id.*).  It dropped both the conspiracy and injunctive relief counts but added a claim for unjust enrichment/restitution. (*Id.*).  Of the four claims asserted in the Third Complaint, only the conversion and unjust enrichment claims mentioned Lynne Gibbons.  (*Id.*).  In the conversion claim, the Bank alleged Lynne Gibbons converted funds of Bank customers for her personal use, although not necessarily with an improper motive.  (*Id.* ¶¶ 50–53).  In the unjust enrichment claim, the Bank alleged Lynne Gibbons benefitted from the Bank by using $306,112.55 of funds that belonged to its customers for her personal use, under circumstances that made it inequitable for her to retain the funds.  (*Id.* ¶¶ 71–74).

On Sept. 28, 2005, the Bank settled its claims against the other defendants, but the conversion and unjust enrichment claims against Lynne Gibbons continued.  (Def. Mot. Ex. 33, ("Settlement Agreement")).  Lynne Gibbons did not want to settle the Bank's lawsuit against her and she claims the Bank sought more money from her than from other defendants because of her choice to defend the suit.  (Def. Mot. Ex. 32; Pl.'s Opp'n at 26).  On February 22, 2006, the trial

---

[3] The parties give different dates for the filing of the Third Complaint.  The Bank states it filed the Third Complaint on June 8, 2005 (Def. Mot. at 8).  Plaintiff gives the date as June 6, 2005 (Pl.'s Opp'n Ex. 23).  The date of filing is not material to the disposition of this case.

court granted Lynne Gibbons' motion for summary judgment.  (Pl.'s Answer ¶ 85).  The Court

of Special Appeals later reversed that decision with respect to the unjust enrichment claim,

holding that Lynne Gibbons' professed ignorance of her husband's theft did not preclude the

Bank from prevailing in its suit.  *Bank of Am. Corp. v. Gibbons*, 918 A.2d 565, 575–76, 578

(Md. App. 2007).  Nevertheless, the Bank voluntarily dismissed its action against Lynne

Gibbons on Oct. 23, 2007, a decision the Bank avers was due to the fact that the cost of litigation

was greater than its potential recovery.  (Def. Answer ¶ 101; *see also* Def. Mot. at 13).

Throughout the lawsuit, the Bank was primarily represented by attorney William Rudrow.  (Def.

Answer ¶ 108).

   b. Seizure of Bank Accounts

   The Bank took other legal actions to secure assets held by Thomas and Lynne Gibbons.

On April 15, 2005, the same day it filed the First Complaint, the Bank obtained a temporary

restraining order ("TRO") to seize the Provident and BANA accounts, as well as several

custodial accounts controlled by Thomas Gibbons and/or Thomas Gibbons' mother.  (Def. Mot.

Ex. 13 at 11).  The trial court modified the TRO on May 4, 2005 to release funds in the custodial

accounts to Lynne and Thomas Gibbons.  (Def. Mot. Ex. 14).  Later in 2005 Lynne Gibbons

notified the Bank that she would release any interest she had in the Provident Accounts.  (Pl.'s

Opp'n Ex. 25).  The Bank also liquidated the funds in the Gibbonses' joint savings account,

which contained $4,796.14.  (*See* Pl.'s Opp'n Ex. 12 at 17).  In answers to interrogatories, the

Bank said the funds were liquidated on or about March 23, 3006, under the terms of its

settlement with Thomas Gibbons.  (*Id.*).  But in a later Declaration, a senior investigator for

BANA said the BANA checking and savings accounts were liquidated on May 19, 2005 and the

funds were comingled with other Bank monies.  (Def. Mot. Ex. 15, Decl. of Dulcie Martin ¶ 13).

On June 10, 2005, Lynne Gibbons, through her attorney, asked the funds in the family savings account be returned to her but the Bank did not respond to her request.  (Pl.'s Opp'n Ex. 48).

The Bank argues its relationship with its customers is governed by its Deposit Agreement, a copy of which was given to the Gibbonses when they opened the BANA accounts. (Martin Decl. ¶¶ 9–10; Def. Mot. at 6).  The Deposit Agreement states that all persons whose names appear on joint accounts act as the agent of the other co-owners and are authorized to operate the account without the consent of the other co-owners.  (Def. Mot. Ex. 16 at 6–7).  It also states, under the heading "Right of Setoff," that the Bank "may recover amounts you owe us from any account you maintain with us or with our affiliates without notice to you . . . ."  (*Id.* at 63).

       c.   Deed Conveying Interest in Family Home

The Bank also sought an interest in the Gibbonses' home.  As part of his settlement agreement with the Bank, Thomas Gibbons signed a quit-claim deed purporting to convey his interest in the Gibbonses' house, located at 727 Annatana Drive in Forest Hill, Maryland ("family home"), to Bank of America.[4]  (Def. Ex. 33 ¶ 3).  Although Thomas and Lynne Gibbons owned the home as tenants by the entirety, the agreement stated that the deed was to become "immediately effective" "upon a severance" of the tenancy by the entirety, whether by divorce or otherwise.  (*Id.*).  The Bank filed the deed with the Harford County, Maryland, land records office.  (Def. Answer ¶ 72).

The federal government also sought an interest in the family home after Thomas Gibbons pled guilty to bank fraud in May 2006.  Thomas Gibbons was sentenced to 51 months

---

[4] The deed does not specify a particular Bank of America Entity.  (Def. Ex. 33, Settlement Agreement, ¶ 3).

imprisonment and ordered to pay more than $1.6 million in restitution.  (Def. Mot. Exs. 39, 40).

As a result of the restitution order, the United States recorded a judgment lien on the family

home.  (Def. Mot. Ex. 41).  The lien attached despite the fact that the property is held in tenancy

by the entirety; the lien remains on the property until Thomas Gibbons satisfies the full amount

of his restitution.  (*Id.*; *see also* Def. Mot. at 12–13).

In October 2006, Lynne Gibbons filed suit in state court seeking both to divorce her

husband and to quiet the Bank's title in the family home.  (Pl.'s Opp'n Ex. 34).  However,

because of the Bank's deed and the lien on the home, Lynne Gibbons suspended the divorce

action for fear that changing the ownership of the property would enable the Bank to force a sale

of the home.  (2011 L. Gibbons Decl. ¶ 70).  She also claims the Bank's deed made her unable to

refinance her mortgage.  (*Id.* ¶ 67–69).  The deed was later declared null.  (Def. Mot. Ex. 36 at 7)

4.   Emotional Impact of Events on Lynne Gibbons

The months after her husband's fraudulent scheme was discovered were traumatic for

Lynne Gibbons.  Around the time Thomas Gibbons phoned her in April of 2005 to say that he

had been fired and that he had defrauded the Bank, Lynne Gibbons learned that her husband was

a philanderer and was under criminal investigation by the Federal Bureau of Investigation

("FBI").  (2011 L. Gibbons Dep. 157:4–160:24).  The FBI executed a search warrant at the

family's home on April 29, 2005, which she and her family claimed was so upsetting to Lynne

Gibbons that her brother wrote a letter of complaint to the FBI.  (*Id.* 161:8–25; Def. Mot. Ex.

20).  By the end of May 2005, Lynne Gibbons was overwhelmed, depressed, and worried, and

she began seeing a therapist.  (2011 L. Gibbons Decl. ¶ 37).  On June 20, 2005, Lynne Gibbons

was admitted to Sheppard & Enoch Pratt Hospital ("Sheppard Pratt") after apparently attempting

suicide by sitting in a running car in her closed garage the previous day.  (*Id.* ¶¶ 40–43).  Later

that summer Lynne Gibbons' health appears to have improved.  She began working part-time

and taking classes to reactivate her nursing license.  (2011 L. Gibbons Dep. 20:25–23:7).  In

2006, Lynne Gibbons resumed full-time work as a NICU nurse.  (*Id.*).  During her June 2005

admission to Sheppard Pratt, Lynne Gibbons also developed a relationship with another patient;

he  moved into the family home before January 2006.  (Def. Mot. Ex. 28, Arthur Carbo Dep.,

27:1–4; Def. Mot. Ex. 23, Decl. of Robert Gibbons ¶¶ 8–10).

Lynne Gibbons claims that as a result of the Bank's conduct toward her, including its

threats to force a severance and sale of the family home, she suffered emotional distress

including panic attacks, insomnia, nightmares, loss of appetite, severe depression, and an

inability to leave the family home.  (2011 L. Gibbons Decl. ¶ 26).

## II.      STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil

Procedure when there is no genuine issue as to any material fact and the moving party is plainly

entitled to judgment in its favor as a matter of law.  In *Anderson v. Liberty Lobby, Inc.*, the

Supreme Court explained that in considering a motion for summary judgment, "the judge's

function is not himself to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial."  477 U.S. 242, 249 (1986).  A dispute about

a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  *Id.* at 248.  In analyzing whether a genuine issue of material fact exists,

the evidence and reasonable inferences from that evidence must be viewed in the light most

favorable to the nonmoving party.  *Id.* at 255.

III.     ANALYSIS

Lynne Gibbons asserts seven claims in this action: three claims of malicious use of process, and one claim each of abuse of process, intentional infliction of emotional distress, conversion, and slander of title.[5]  Each is addressed in turn.

1.   Malicious Use of Process (Counts I–III)

In Maryland, the tort of malicious use of process is disfavored.  *See One Thousand Fleet Ltd. P'ship v. Guerriero*, 69 A.2d 952, 955–56 (Md. 1997).  Public policy requires that citizens be free to resort to the courts to resolve grievances without fearing their opponent will retaliate by initiating a claim for malicious use of process.  *Id.*

To state a claim for malicious process, a plaintiff must prove five elements.  *Id.* at 956.  First, the defendant must have instituted a prior civil proceeding.  *Id.*  Second, the prior proceeding must have been instituted without probable cause.  *Id.*  Third, defendant must have instituted the prior proceeding with malice, meaning the party was "actuated by an improper motive."  *Id.*   (citing *Keys v. Chrysler Credit Corp.*, 494 A.2d 200, 205 (Md. 1985)).  Such malice can be inferred through a lack of probable cause.  *See Keys*, 494 A.2d at 206.  Fourth, the proceedings must have terminated in favor of the plaintiff.  *One Thousand Fleet,* 69 A.2d at 956 (citing *Berman v. Karvounis*, 518 A.2d 726, 729 (Md. 1987)).  Fifth, the plaintiff must establish her damages were inflicted by arrest, imprisonment, seizure of property, or other special injury

---

[5] Plaintiff's complaint attempts to assert an additional claim, titled "Respondeat Superior for Attorney Rudrow's Tortious Conduct."  (Compl. ¶¶ 147–152).  However, respondeat superior is not a standalone claim but a theory of liability under which an employer can be held liable for the tortious conduct of an employee if the employee was acting within the scope of his employment.  *See, e.g.*, *Barclay v. Ports Am. Baltimore, Inc.* 18 A.3d 932, 937 (Md. App. 2011). Because it is not a standalone claim—and Plaintiff's Mot. in Opposition does not argue to the contrary—the issue is not addressed here.

that would not necessarily result in all suits prosecuted to recover for a like cause of action. *Id.* (citing *Keys*, 494 A.2d at 205; *Owens v. Graetzel*, 132 A. 265, 267 (Md. 1926)). *See also Tomai-Minogue v. State Farm Mut. Auto. Ins. Co.*, 770 F.2d 1228, 1237 (4th Cir. 1985); *Berman*, 518 A.2d at 729. The absence of any element is fatal to the claim. *Herring v. Citizens Bank & Trust Co.*, 321 A.2d 183, 195 (Md. App. 1974).

Lynne Gibbons alleges the Bank filed the first, second, and third complaints in the underlying suit maliciously, in a manner that amounts to malicious use of process. (Second Am. Compl. ¶¶ 110–133). In this case, however, the presence of probable cause is determinative. The plaintiff has the burden to show the defendant lacked probable cause to initiate the underlying suit. *See Seneschal v. AM Broadband*, *LLC*, No. CCB-08-2171, 2010 WL 3522436, at * 6 (D. Md. Sept. 8, 2010). In the context of claims for malicious use of process, probable cause means "a reasonable ground for belief in the existence of such state of facts as would warrant institution of the suit or proceeding complained of." *One Thousand Fleet*, 69 A.2d at 956 (citing *North Pt. Constr. Co. v. Sagner*, 44 A.2d 441, 445 (Md. 1945)). It is measured by the facts known at the time the prior action was instituted. *Seneschal*, 2010 WL 3522436, at *6 . When the facts are undisputed with respect to probable cause, its presence or absence is a question of law for the court. *Campbell v. Lake Hallowell Homeowners Ass'n*, 852 A.2d 1029, 1045 (Md. App. 2004) (quoting *Sagner*, 44 A.2d at 444).

It is clear Defendants here had probable cause to initiate the prior suit. Before it filed the First Complaint, the Bank learned that Lynne Gibbons was joint owner of two of the bank accounts Thomas Gibbons used in his fraudulent scheme, that her name appeared on all checks out of the Joint Provident Account, and that she regularly wrote checks out of the BANA joint checking account after her husband deposited stolen funds into that account. (*See* Magnotta

Decl. ¶¶ 15–20, 23, 25; Altman Dep. 6:9–28:3, 33:11–17; 35:3–8, Def. Mot. Ex. 6).   Under these circumstances, it was not unreasonable for the Bank to believe that Lynne Gibbons knew of or participated in her husband's fraud.   The fact that the Third Complaint dropped the conspiracy claim against Lynne Gibbons does not mean it was unreasonable for the Bank to make such a claim in the First Complaint.   Accordingly, because the Bank did not institute the previous suit against the Plaintiff without probable cause, Plaintiff cannot maintain an action for malicious use of process.   Summary judgment on these claims will be granted to Defendants.

   2.   Abuse of Process (Count IV)

   In contrast to claims for malicious use of process, the tort of abuse of process is concerned with the improper use of criminal or civil process in a manner not contemplated by law *after* it has been issued.   *Walker v. Am. Sec. & Trust Co. of Wash., D.C.*, 205 A.2d 302, 306–07 (Md. 1964) (emphasis added).   To sustain an action for abuse of process, a plaintiff must prove three elements.   *Humphrey v. Herridge*, 653 A.2d 491, 493 (Md. App. 1995).   First, there must be a willful use of process for an illegal purpose.   *Id.*   Second, the plaintiff must show an ulterior motive underlying the use of process.   *Id.*   Third, the plaintiff must prove damages resulting from the perverted use of process.   *Id.*   A defendant is not liable, however, if its actions consist "solely of seeing the lawsuit through to its 'authorized conclusion,' even if he or she did so with bad motives."   *See Wallace v. Mercantile Cnty. Bank*, 514 F. Supp. 2d 776, 793 (D. Md. 2007) (quoting *One Thousand Fleet*, 694 A.2d at 956).

   Lynne Gibbons asserts several bases for her abuse of process claim.   She claims Defendants misused the TRO to seize her property and put her and her five children "into dire financial straits in order to improperly harass, intimidate, and coerce the Plaintiff, the Plaintiff's

in-laws, and Thomas Gibbons to pay Thomas Gibbons' debts arising from the scheme to defraud

. . . ." (Second Am. Compl. ¶135).   She further argues that Defendants unlawfully used the

discovery process in the underlying suit to "retaliate against, punish, and harass" her.  (*Id.* ¶ 136).

She also alleges the Defendants misused civil process by moving to stay the action she filed

seeking both to quiet title against the Bank and to divorce Thomas Gibbons.  (*Id.* ¶ 137–38).   In

support of this claim, Lynne Gibbons alleges the Bank used the TRO and the deed as "leverage

to intimidate and coerce Plaintiff into giving up her family home and to extort payments from

[Thomas] Gibbons' parents. . ."  (Pl.'s Opp'n at 46).   She argues these actions "betray ulterior

motives because these are purposes other than bringing the wrongdoer to justice."  (*Id.*).

It is true that the Bank's attorney suggested Lynne Gibbons' in-laws might be willing to

contribute to a settlement.  (Def. Mot. at 28).   But there is no evidence that any of the actions

Plaintiff complains of were anything more than an interest in settlement, in which it is "standard

practice to seek an agreement where both sides derive benefits as well as make concessions."

*Wallace*, 514 F. Supp. at 793.   Indeed, attempting settlement falls "within the scope of pursuing a

lawsuit to its authorized conclusion."  *Id.*   Each of the actions Plaintiff complains of appear to be

actions directed at recouping the misappropriated funds, either by pursuing the claim through

discovery requests, or through legal processes designed to preserve assets until the Bank's

interest in those assets could be fully litigated, or through settlement negotiations.  Lynne

Gibbons has failed to raise any triable issue of fact on the Bank's purported illegal purpose.

Summary judgment on this claim will therefore be granted to Defendants.

3.   Intentional Infliction of Emotional Distress (Count V)

The tort of intentional infliction of emotional distressed has four elements.  *See Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977).  First, the defendant's conduct must be intentional or reckless.  *Id.*  Second, the conduct must be extreme and outrageous.  *Id.*  Third, there must be a causal connection between the wrongful conduct and the emotional distress.  *Id.*  Fourth, the emotional distress must be severe.  *Id.*  Since Maryland recognized the tort in 1977, courts have upheld claims for intentional infliction of emotional distress only sparingly, and only in cases that involve "truly egregious acts."  *Baston v. Shiflett*, 602 A.2d 1191, 1216 (Md. 1992).  *See also Lasater v. Guttman*, 5 A.3d 79, 90 (Md. App. 2010) (observing that the Court of Appeals has upheld such claims only four times in the past three decades).

Because the failure of any element will defeat the cause of action, we need only address one element.  *Hrehorovich v. Harbor Hosp. Ctr., Inc.*, 614 A.2d 1021, 1035 (Md. App. 1992).  In this case, it is clear that the Defendants' conduct was not extreme or outrageous enough to satisfy the tort's second element.  To be outrageous, conduct must be "so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Harris*, 380 A.2d at 614 (quoting Restatement (Second) of Torts § 46 comment d (1965)).  Whether conduct meets this test of outrageousness is, in the first instance, for the court to determine.  *Baston*, 602 A.2d at 1216.

In evaluating the outrageousness of a defendant's conduct, courts must consider the overall context in which it occurred.  *Harris*, 380 A.2d at 615.  Conduct that would otherwise be extreme and outrageous can be privileged in some circumstances.  *Young v. Hartford Accident and Indem. Co.*, 492 A.2d 1270, 1277 (Md. 1985).  A defendant is "never liable, for example,

where he has done no more than to insist upon his legal rights in a permissible way, even though

he is well aware that such insistence is certain to cause emotional distress." *Id.*  In measuring

outrageousness, a court must inquire "into whether the actor was legally entitled to act as she or

he did." *Foy v. Giant Food Inc.*, 298 F.3d 284, 288 (4th Cir. 2002).  Courts have therefore

dismissed claims for intentional infliction of emotional distress when a defendant's conduct

amounts to no more than pursuing or threatening to pursue actions to which it is legally entitled.

*See, e.g.*, *Miller v. Ratner*, 688 A.2d 976, 996 (Md. App. 1997) (affirming summary judgment

for defendant who threatened to evict his girlfriend from his home in part because "regardless of

the morality of his position, she had no legal right to remain."); *Walser v. Resthaven Mem'l

Gardens, Inc.*, 633 A.2d 466, 477 (Md. App. 1994) (no cause of action for disinterring stepson's

body when no facts showed the disinterment was undertaken to inflict emotional distress on

defendant's husband's ex-wife); *Pemberton v. Bethlehem Steel Corp.*, 502 A.2d 1101, 1115 (Md.

App. 1986) (affirming summary judgment for defendant who distributed truthful information

about plaintiff's criminal history and sent truthful information about plaintiff's extramarital

affairs to plaintiff's wife).

In the context of creditors, even "threats to sue, threats to ruin [plaintiff's] credit, and

threats to attach [plaintiff's] house and property" have failed this test of outrageousness.

*Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1063–64  (Md. App. 1986).  Creditors "have

the right to insist on payment of just debts and may threaten legal proceedings" even when

persistent attempts to extract payments "were unquestionably offensive" to the plaintiff.  *Id.* at

1064.  *See also Dick v. Mercantile-Safe Deposit & Trust Co*., 492 A.2d 674, 676–77 (Md. App.

1985) (no claim for creditor's repeated insults and shouts, threats to attach plaintiffs' house and

salary if they declared bankruptcy, and demands that they not contest a summary judgment proceeding to collect debts).

Defendants here had probable cause to initiate the prior lawsuit, as discussed above. Moreover, Defendants' actions were designed to pursue claims to which they were legally entitled.  They fall woefully short of the outrageousness required to maintain a claim for intentional infliction of emotional distress.  Summary judgment will therefore be granted to Defendants on this count.

4.  Conversion (Count VII)

Conversion is any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it.  *Interstate Ins. Co. v. Logan*, 109 A.2d 904, 907 (Md. 1954); *Doka USA, Ltd. v. Gateway Project Mgmt.*, No. WDQ–10–1896, 2011 WL 3236091, at *5 n.15 (D. Md. July 27, 2011); *IFCO Sys. N. Am., Inc. v. Am. Home Assurance Co.*, WMN–09–2874, 2011 WL 2532902, at *2 (D. Md.  June 23, 2011).  A claim for conversion consists of two elements: a physical act combined with a certain state of mind.  *Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 835 (Md. 2004).   The physical act of ownership or dominion over the personal property of another can occur either by initially acquiring the property or by retaining it longer than the rightful possessor permits.  *Id.* The intent element is satisfied by a "wide range of different states of mind."  *Id.* at 836.  At a minimum, to be liable for conversion a defendant must have "'an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights.'"  *Id.*  (quoting *Keys*, 494 A.2d at 208).

As a general rule, monies are intangible and therefore not subject to a claim for conversion. *Allied Inv. Corp. v. Jasen*, 731 A.2d 957, 966 (Md. 1999). An exception exists if a plaintiff can allege the defendant converted specific segregated or identifiable funds. *Id.* This exception is recognized with funds that have been or should have been segregated for a particular purpose or that have been wrongfully obtained or retained or diverted in an identifiable transaction. *Id.* (citing Harper, The Law of Torts, § 2.13, at 2:56 (2d ed. 1986)). Such claims are defeated, however, if a defendant retains possession of the funds and commingles them with other monies, because the money "loses its specific identity and may no longer be the subject of a conversion action." *Simmons v. Lennon*, 773 A.2d 1064, 1075 (Md. App. 2001) (citing *Jasen*, 731 A.2d at 957).

In this case, Lynne Gibbons argues the Bank unlawfully converted funds she held in the BANA joint accounts in two ways. She argues first that the Bank exercised unlawful control over the funds when it seized them pursuant to the TRO. (Pl.'s Opp'n at 55). She also argues the Bank illegally refused to release funds in the BANA savings account to her after the TRO expired but before the Bank entered into a settlement agreement with Thomas Gibbons. (*Id.*).

Plaintiff's first argument fails. Conversion "necessarily involves the idea that the interference with another's property be wrongful." *Mercantile-Safe Deposit & Trust Co. v. Delp & Chapel Concrete & Constr. Co.*, 408 A.2d 1043, 1050 (Md. App. 1979); *see also Froelich v. Erickson*, 96 F. Supp. 2d 507, 526 (D. Md. 2000). In this case, when the Bank exercised control over Plaintiff's funds pursuant to the TRO, it did so in a manner authorized by law. The TRO prohibited Thomas and Lynne Gibbons from transferring any funds that either or both controlled, including funds in the Provident Accounts and BANA Accounts. (Def. Mot. Ex. 13 ¶ 6). The

Bank therefore did not exercise unlawful control over the funds and its action to freeze the

BANA accounts pursuant to the TRO cannot be the basis for a conversion claim.

Plaintiff's second argument—that the Bank unlawfully refused to release funds in the

BANA savings account after the TRO expired and before the Settlement Agreement with

Thomas Gibbons—also fails.  In Maryland, the relationship between a Bank and its customer is

contractual.  *Lema v. Bank of Am.*, 826 A.2d 504, 511 (Md. 2003).  In the present case, the

Plaintiff has not disputed that she and Thomas Gibbons signed a signature card for the joint

BANA Accounts.  (Def. Mot. Ex. 10).  Those signature cards and the Deposit Agreement with

the Bank constitute the contract between the Gibbonses and the Bank.  *Lema*, 826 A.2d at 512.

The Deposit Agreement plainly authorizes the Bank to set off funds in a joint account to repay

the debts owed by any person whose name is on that account.  (Def. Mot. Ex. 16 at 63).  The

Bank's seizure of funds in the family savings account was therefore permissible under the

Deposit Agreement, to set off the debts owed to the Bank by Thomas Gibbons.  *See Wynn v.

Wachovia Bank, N.A.*, No. 3:09CV136, 2009 WL 2147629, * 7 (E.D. Va. July 14, 2009)

(Deposit Agreement authorized Bank to debit customer's account to obtain any money she owed

to Bank, defeating conversion claim); *Seighman v. Wachovia Bank, N.A.*, No. 3:08CV435, 2008

WL 4534184, *5 (E.D. Va. Oct. 6, 2008) (Bank's reversal of deposits did not constitute

conversion because Deposit Agreement permitted Bank to charge customer's account).

The Bank's action therefore cannot constitute conversion because the taking itself was

not wrongful.  Defendants' motion for summary judgment on these counts will be granted.

5.  Slander of Title

To maintain a claim for slander of title, also known as the tort of injurious falsehood, a plaintiff must establish that the defendant, with malice, published a known falsity to a third party that caused special damages.  *See Neurotron, Inc., v. Am. Assc. Electrodiagnostic Med.*, 189 F. Supp. 2d 271, 277 (D. Md. 2001) (listing elements); *Horning v. Hardy*, 373 A.2d 1273, 1277–78 (Md. 1977) (labeling the tort "injurious falsehood," rather than slander of title).  The cause of action is similar to defamation but "differs from [defamation] materially in the greater burden of proof resting on the plaintiff, and the necessity for special damages in all cases." *Beane v. McMullen* 291 A.2d 37, 49 (Md. 1972).  In addition, the plaintiff must prove the publication played "a material and substantial part in inducing others not to deal with him, and that as a result he suffered special damage." *Id.*

Malice exists when a defendant acts with the purpose to harm a plaintiff in a way he is not privileged to do, or when the defendant knows what he says is false (regardless of whether he has an ill motive or intends to affect the Plaintiff), or when a defendant is motivated by spite. *Hardy*, 373 A.2d at 1278.  Absent such malice, there is no liability. *Id.*  A defendant is not liable if he acts in good faith, even if he was negligent in failing to ascertain the facts before making the statement at issue. *Id.*  Moreover, Maryland recognizes as a defense to such claims a conditional privilege that entitles Defendants to assert their own legal claims to property of another. *Dixon v. Process Corp.*, 416 A.2d 1295, 1299 (Md. 1980).  Under that privilege:

> [A] rival claimant is privileged to assert the inconsistent [legal] interest unless a trier of fact is persuaded that he did not believe in the possible validity of his claim.  It is not necessary that the person asserting the claim should believe in its certain or even probable validity.  It is enough if he believes in good faith that there is a substantial chance of its being sustained.  Bad faith is treated as an abuse of the privilege . . . . *Dixon*, 416 A.2d at 1299 (quoting Restatement (Second) of Torts § 647 comment d).

Accordingly, persons who in good faith assert their own legally protected interest in the property of another are not are not liable. *Id.*; *Cambridge Title Co. v. Transamerica Title Ins. Co.*, 817 F. Supp. 1253, 1277 (D. Md. 1992).

In this case, the privilege recognized in *Dixon* protects the Bank from liability. By filing the deed it received from Thomas Gibbons under the Settlement Agreement, the Bank was merely protecting its interest in the property. Although the deed was later declared a nullity, there is no evidence that Bank filed the deed with malice. *Cf. Dixon*, 416 A.2d at 1299; *Cambridge Title Co.*, 817 F. Supp. at 1277. Lynne Gibbons also argues that the Bank's failure to remove the deed from the land records after it was declared null is actionable, but this claim also fails. The same state court that declared the deed null refused to order it removed from the land records. (Def. Ex. 36 at 7). The Bank's conduct in not removing the deed therefore cannot be deemed malicious. For these reasons, summary judgment will be granted to Defendants on this claim.

For the foregoing reasons, Defendants' motion for summary judgment is granted. A separate order is being entered herewith.

Date: January 11, 2012                  /s/ _____

                                        J. Frederick Motz

                                        United States District Judge